UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM KLAMUT, | Case No. 15-cv-02132-MEJ |
| Plaintiff, | |
| v. | **ORDER RE: MOTION FOR SUMMARY JUDGMENT** |
| CALIFORNIA HIGHWAY PATROL, et al., | Re: Dkt. No. 52 |
| Defendants. | |

## INTRODUCTION

Plaintiff William Klamut ("Plaintiff") sued California Highway Patrol ("CHP") Officer Seth Nibecker and CHP Sergeant Daniel Wheeler (collectively, "Defendants") for allegedly violating Plaintiff's rights during an arrest. *See* Am. Compl., Dkt. No. 10. Plaintiff asserts an excessive force claim under the Fourth Amendment of the United States Constitution, and claims under the Americans with Disabilities Act ("ADA"). *See id*. The Court previously dismissed Plaintiff's ADA claims, with leave to amend. *See* Order of Dismissal, Dkt. No. 30. Plaintiff did not amend. The Court also previously dismissed a number of Defendants and granted Defendants partial summary judgment regarding some of Plaintiff's excessive force claims. *See* First Summ. J. Order, Dkt. No. 66. Defendants now move for summary judgment on Plaintiff's remaining claim for excessive force. Mot., Dkt. No. 52. Plaintiff filed an Opposition (Dkt. No. 59), and Defendants filed a Reply (Dkt. No. 61).

The Court heard oral argument on December 8, 2016. Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **DENIES** Defendants' Motion for the following reasons.

//

**MATERIAL FACTS**

**A.      Initial Interactions with Plaintiff inside his Vehicle**

On May 10, 2013, Plaintiff was driving on northbound Highway 101 when his vehicle ran out of gas and hit a guardrail on the passenger side of his car.  Opp'n at 1.  At approximately 9:52 a.m., Camp Roberts Emergency Services ("CRES") responded to a report from a Caltrans supervisor about a motor vehicle accident on northbound Highway 101 at the Jolon Bradley interchange.  Mot. at 5; Declaration of Steven Bradley ("Bradley Decl.") ¶ 3, Dkt. No. 57.  The Caltrans supervisor stated "the vehicle had been acting strange and appeared to have new front end damage."  Mot. at 5.  Upon arriving at the scene, CRES found a male subject—later identified as Plaintiff—sitting in a blue vehicle stopped in the number two lane.  *Id.*; Bradley Decl., CRES Report at ECF p.4.  CRES firefighter Rod Landis attempted to make contact with Plaintiff, which Plaintiff ignored.  *Id.* (both).  Plaintiff then drove the vehicle forward approximately 50 feet before stopping.  *Id.*  The CRES unit pulled in front of the vehicle and requested CHP assistance.  *Id.*

A California Department of Forestry and Fire Protection ("CalFire") unit soon arrived at the scene and observed a blue Subaru.[1]  Mot. at 5; Declaration of Travis Eicher ("Eicher Decl.") ¶ 2, Dkt. No. 56.  One firefighter approached the vehicle to contact Plaintiff; that firefighter "returned saying that Plaintiff was 'upset or crazy or something.'"  Mot. at 5 (quotation marks in original; no citation); *see* Eicher Decl. ¶ 2.  The vehicle's doors were locked and windows were rolled up.  *Id.* (both).  CRES firefighter Travis Eicher then attempted to contact Plaintiff by tapping on the window.  *Id.*  Plaintiff ignored Eicher's efforts and appeared to be texting on his cell phone.  *Id.*  Eicher then tapped on the windshield; at that point, Plaintiff gave Eicher the middle finger and screamed, "You motherfucker!  Leave me the fuck alone!  I'm from Planet Magwa!"  *Id.*  Eicher again attempted to contact Plaintiff at least once more[2] but received the same

---

[1] There is some discrepancy as to what the CalFire unit observed.  In their Motion, Defendants state the CalFire unit "saw a blue Subaru driving about 5 mph northbound on Highway 101 in the #2 lane.  The fire truck moved in front of the Subaru and forced it to stop."  Mot. at 5.  However, Eicher declares that "[w]hen we reached the scene we found a blue Subaru stopped half on the shoulder, half in the #2 lane."  Eicher Decl. ¶ 2.

[2] Eicher states he made one more attempt (Eicher Decl. ¶ 2); Defendants represent he made two

United States District Court
Northern District of California

1  response.  *Id.*  At that point, Eicher returned to his truck and requested to "[e]xpedite law

2  enforcement."  *Id.*  Eicher then told firefighters from the National Guard Base at Camp Roberts

3  who were also on-scene that Plaintiff was potentially violent and to avoid putting themselves in a

4  place where he could drive into them.[3]  Eicher Decl. ¶ 3.

5           At 9:48 a.m., Monterey County Sheriff's Department Deputy Sheriff Jason Sclimenti

6  responded to a call to assist the CHP in the investigation of an accident on northbound Highway

7  101 near the northbound Jolon Bradley onramp.  Declaration of Jason C. Sclimenti ("Sclimenti

8  Decl.") ¶ 1; Dkt. No. 55; *see* Eicher Decl. ¶ 4.  CalFire briefed Deputy Sclimenti about the

9  situation and "advised [him] that a Caltrans worker had witnessed the Subaru strike a guardrail

10  south of [their] location."  Sclimenti Decl. ¶ 3; *see* Mot. at 6; Eicher Decl. ¶ 4.  CalFire further

11  advised Deputy Sclimenti that

12           when the fire personnel arrived, they saw that the Subaru was
             stopped in the slow lane of northbound Highway 101.  Fire
13           personnel approached the Subaru and asked the driver, later
             identified as William Klamut, if he had any injuries.  Klamut rolled
14           up the windows on his car, locked all the doors and said, "Fuck off."
             As fire personnel attempted to communicate with Klamut, [h]e
15           would drive his car forward a few feet and then stop.  They were
             unable to get a response from Klamut and he would not exit his
16           vehicle.

17  Sclimenti Decl. ¶ 3.  Deputy Sclimenti approached the Subaru and noticed the right front fender

18  was damaged.  *Id.* ¶ 4.  Deputy Sclimenti knocked on the window to get Plaintiff's attention,

19  announced he was a Deputy with the Monterey County Sheriff's Department, and asked Plaintiff

20  if he could unlock the door so he could be checked for injuries.  *Id.*  Plaintiff ignored Deputy

21  Sclimenti and continued to text on his cell phone.  *Id.*  Deputy Sclimenti moved his patrol car in

22  front of the Subaru to prevent Plaintiff from driving forward.  *Id.* ¶ 6.

23           Officer Nibecker arrived on scene at 10:11 a.m., the same time as CHP Officer Murillo.[4]

24

25  further attempts (Mot. at 5).

26  [3] Defendants do not state when the Camp Roberts firefighters arrived.

27  [4] There is some discrepancy as to when Officer Murillo arrived.  Officer Nibecker and Defendants
    state Officers Nibecker and Murillo arrived at the same time.  Mot. at 7; Nibecker Decl. ¶ 4.
28  According to Deputy Sclimenti, Officer Murillo arrived while he and Officer Nibecker were

3

United States District Court
Northern District of California

Mot. at 6-7; Declaration of Seth Nibecker ("Nibecker Decl.") ¶¶ 3-4, Dkt. No. 53; *see* Sclimenti Decl. ¶ 6.  At approximately 9:45 a.m., CHP dispatch had advised Officer Nibecker of a traffic collision on northbound Highway 101 near Bradley Road and of the fact that a Caltrans employee had attempted to contact Plaintiff, who was conscious, appeared uninjured, and was unresponsive to the presence of emergency personnel.  Nibecker Decl. ¶ 2.  Officer Nibecker parked his vehicle behind the rear fire truck to create a temporary traffic break.  *Id.* ¶ 3.  He spoke with Caltrans, Deputy Sclimenti, and CalFire and Camp Roberts firefighters, all of whom reported making numerous unsuccessful attempts to get Plaintiff to unlock the doors of his Subaru.  Nibecker Decl. ¶ 4.

Officer Nibecker found Plaintiff in the driver's seat of the Subaru with the windows rolled up and doors locked.  *Id.*  Officer Nibecker attempted to contact Plaintiff by knocking on the window and loudly directing him to open the door; Plaintiff ignored Officer Nibecker and continued to talk or text on his cell phone.  *Id.* ¶ 5.  Officer Nibecker asked CalFire personnel to place wheel chocks under the Subaru's tires to prevent it from leaving unexpectedly.  *Id.*

Plaintiff does not dispute these events occurred.  He admits he was unresponsive to a Caltrans employee's attempts to contact Plaintiff while Plaintiff was in his car.  Opp'n at 1.  He further admits Defendants arrived on scene and asked Plaintiff to exit his vehicle; that he responded by stating that he was an alien; and that he declined to get out of his vehicle.  *Id.*

**B.      Plaintiff's Removal from the Subaru and Arrest**

Officer Nibecker called CHP Lieutenant Mann[5] to explain the situation.  Nibecker Decl. ¶ 6.  Lieutenant Mann and Officer Nibecker agreed that the best course of action was to gain access to the Subaru by breaking the passenger side window and unlocking the vehicle's doors to remove Plaintiff.  *Id.*  Officer Nibecker gave a loud, clear order to Plaintiff to unlock the doors or Officer Nibecker would have to break the window.  *Id.* ¶ 7; *see* Eicher Decl. ¶ 5.  Plaintiff ignored this order.  *Id.* (both).  Officer Nibecker proceeded to break the passenger window with a window

---

attempting to elicit a response from Plaintiff.  Sclimenti Decl. ¶ 7.

[5] The parties do not provide Lieutenant Mann's first name.  *See* Am. Compl.; Mot.; Opp'n.

punch, unlocked the doors, and asked Plaintiff to step out of the vehicle.  Nibecker Decl. ¶ 7; Sclimenti Decl. ¶ 9.  Officer Murillo and Deputy Sclimenti, who were positioned on the other side of the Subaru, opened the driver's door and attempted to grasp Plaintiff's left hand.  *Id.* (both).  At that point, Plaintiff became combative and started screaming.  *Id.*  A violent struggle ensued during which Officer Murillo and Deputy Sclimenti attempted to unfasten Plaintiff's seatbelt while Plaintiff twisted and punched to fight them off.  *Id.*  Plaintiff was "immensely strong."  *Id.* (all); *see* Eicher Decl. ¶ 5 ("Klamut was a very big, muscular man and he was extremely strong.").

Officer Nibecker, fearing for Officer Murillo's and Deputy Sclimenti's safety, deployed his conductive energy weapon ("CEW" or "taser"), which struck Plaintiff's right side.  Nibecker Decl. ¶ 8; *see* Sclimenti Decl. ¶ 9; Eicher Decl. ¶ 5.  Plaintiff showed little effect from the Taser and continued to resist.  Nibecker Decl. ¶ 8; Sclimenti Decl. ¶ 9.  Officer Nibecker proceeded to deploy a second set of darts into Plaintiff's right shoulder and back.  Nibecker Decl. ¶ 8.  Plaintiff remained combative and seemingly unaffected.  *Id.*  Officer Murillo and Deputy Sclimenti were then able to pull Plaintiff out of the vehicle; Officer Nibecker followed Plaintiff through the vehicle and continued to deploy additional cycles from the taser.  *Id.*  The struggle continued once Plaintiff was outside the vehicle and on Highway 101.  *Id.* ¶ 9; Sclimenti Decl. ¶ 9; Eicher Decl. ¶ 5.  "Numerous cycles from the conductive energy weapon were given to Klamut as Officer Murillo and Deputy Sclimenti attempted to gain control of him, but he remained combative and seemingly unaffected by the CEW deployments."  Nibecker Decl. ¶ 9.  In the end, it took the efforts of multiple law enforcement officers to restrain Plaintiff.  *Id.* (noting it took three peace officers and five firefighters); Sclimenti Decl. ¶ 9 (same); *but see* Eicher Decl. ¶ 5 (stating two peace officers and three firefighters assisted).  Throughout the struggle, Plaintiff shouted that he was an immortal being from outer space and that humans did not know what was coming; he also threatened to slit the officers' throats.  Nibecker Decl. ¶ 9; Sclimenti Decl. ¶ 10.  When Plaintiff was handcuffed, he continued to attempt to kick emergency personnel, so Officers Nibecker and Murillo applied a leg restraint to him while firefighters held him still.  Nibecker Decl. ¶ 9; Sclimenti Decl. ¶ 9.  Plaintiff's handcuffs were double-locked, and he was patted down for weapons.  Nibecker Decl. ¶ 9.  Plaintiff was placed in the back seat of Deputy Sclimenti's patrol

United States District Court
Northern District of California

5

United States District Court
Northern District of California

vehicle, which had a prisoner cage.  *Id.*; Sclimenti Decl. ¶ 11.

Plaintiff calmed down once he was in Deputy Sclimenti's vehicle.  Sclimenti Decl. ¶ 12. Plaintiff asked Deputy Sclimenti if the peace officer could contact someone for Plaintiff with Plaintiff's cell phone.  *Id.*  Deputy Sclimenti called Plaintiff's brother and a friend; both calls went to voicemail.  *Id.*  Deputy Sclimenti informed Plaintiff of the unsuccessful phone calls but stated he would attempt to contact a family member.  *Id.*  Deputy Sclimenti eventually reached Plaintiff's mother, who informed Deputy Sclimenti that Plaintiff was not currently taking any drugs or medication and that sleep deprivation likely caused his strange behavior.  *Id.* ¶ 13.  Plaintiff's mother did not mention that Plaintiff suffered from mental illness.  *Id.*  Deputy Sclimenti informed Plaintiff's mother that Plaintiff would be taken to a hospital and that she could contact him there. *Id.*

According to Plaintiff, "one of the defendants" contacted Plaintiff's younger brother, who called Plaintiff's mother, Dr. Judith Froelich.  Opp'n at 1; Declaration of Judith Froelich ("Froehlich Decl.") ¶ 1, Dkt. No. 59-3.  Froehlich declares "the defendant officers informed the plaintiff's mother that they were going to use force to remove the plaintiff out of the car if he did not cooperate."  *See* Opp'n at 1.  Plaintiff's mother "spoke to the defendants and explained" that Plaintiff suffered from sleep deprivation and mental illness and that "[P]laintiff was probably having a psychotic episode secondary to sleep deprivation."  *Id.*; *see* Froehlich Decl. ¶ 2.

"At some point, the defendants broke the passenger side front window and attempted to drag the plaintiff . . . out of the car."  Opp'n at 1.  Plaintiff and Defendants struggled and, at that moment, Officer Nibecker tased Plaintiff in his right upper back and other parts of Plaintiff's body.  *Id.*  Defendants pulled Plaintiff out of the vehicle, handcuffed him, and placed him in a patrol vehicle.  *Id.* at 2.

## C.  Plaintiff's Removal from the Patrol Vehicle

Sometime after Plaintiff was secured in the patrol vehicle, Plaintiff freed his left hand from the handcuffs and removed his leg restraints.  Nibecker Decl. ¶ 11; Sclimenti Decl. ¶ 14; Eicher Decl. ¶ 6.  Officer Nibecker observed Plaintiff with a 4-5 inch folding knife in his left hand and was unsuccessfully attempting to pick the lock on the handcuffs that were on his right wrist.

6

United States District Court
Northern District of California

1  Nibecker Decl. ¶ 11; *see* Sclimenti Decl. ¶ 14 (describing knife as a "three inch foldable knife");

2  Eicher Decl. ¶ 6 (describing knife as a "pocketknife").  Plaintiff eventually closed the knife,

3  "shoved it into his underwear/groin area," and said, "Knife?  What knife?"  Nibecker Decl. ¶ 11;

4  Sclimenti ¶ 14.  Ultimately, Officer Murillo persuaded Plaintiff to surrender the knife by passing it

5  through a gap in the patrol car's prisoner cage.  Nibecker Decl. ¶ 11; Sclimenti Decl. ¶ 17; *see*

6  Eicher Decl. ¶ 6.

7  Plaintiff remained in the patrol vehicle for an hour and a half while CalFire, CHP, and the

8  Monterey Sheriff waited for additional units to arrive.  Nibecker Decl. ¶ 12.  During this period,

9  "practically every officer present" attempted to speak with Plaintiff to calm him down and obtain

10  his cooperation, to no avail.  *Id.*  Plaintiff acted strangely: he stated he was from another planet

11  and appeared to fall asleep, then became alert and yelled at the officers.  *Id.*; Sclimenti Decl. ¶ 16.

12  Lieutenant Mann, Sergeant Daniel Wheeler, and Deputy Bernal arrived at approximately

13  11:25 a.m.  Declaration of Daniel Wheeler ("Wheeler Decl.") ¶ 2, Dkt. No. 54; Nibecker Decl. ¶

14  13; *see* Eicher Decl. ¶ 7 (noting arrival of "several additional CHP units").  Sergeant Wheeler

15  directed the emergency personnel and vehicles to move to Bradley Road, west of Highway 101 so

16  as to hinder Plaintiff's ability to run into freeway traffic if he succeeded in overcoming the

17  officers' attempts to gain control over him and re-handcuff him.  Wheeler Decl. ¶ 3; Nibecker

18  Decl. ¶ 13; *see* Eicher Decl. ¶ 7.

19  Now off the freeway, unidentified person or persons briefed all personnel present on

20  Plaintiff's previous combativeness, unusual strength, and indifference to tasers.  Wheeler Decl. ¶

21  3; Nibecker Decl. ¶ 14.  They were further advised that Plaintiff was not handcuffed, could still

22  have a weapon hidden on his person, and could run.  *Id.* (both).  Emergency personnel discussed a

23  plan to safely remove Plaintiff from the patrol vehicle.  *Id.*

24  Officers took up their positions.  Wheeler Decl. ¶ 4; Nibecker Decl. ¶ 15.  Officer Murillo

25  gave Plaintiff clear, audible commands to exit the patrol vehicle and not become combative.  *Id.*

26  Sergeant Wheeler opened the patrol vehicle's right rear door; Plaintiff briefly stood up, then sat

27  down and closed the door.  *Id.*; Eicher Decl. ¶ 7.  Sergeant Wheeler re-opened the same door and

28  directed Plaintiff to exit the vehicle, but Plaintiff did not comply.  *Id.* (both).  Fearful that another

7

physical confrontation with Plaintiff would likely cause injury to emergency personnel and Plaintiff, Sergeant Wheeler deployed his taser, hitting Plaintiff in his upper torso.  Nibecker Decl. ¶ 15; Wheeler Decl. ¶ 4; *see* Eicher Decl. ¶ 7 ("The door was opened again, and one of the CHP officers deployed his taser.").  Plaintiff again showed little effect from the taser, and he reached out and began to close the door.  *Id.* (all). Officer Nibecker then fired a round of "beanbag projectiles," lead shot encased in a cloth sack.  Nibecker Decl. ¶¶ 15-16.  Although Officer Nibecker aimed at Plaintiff's right leg, the round struck the lower right edge of the door, and Plaintiff was able to close the door.  *Id.* ¶ 15.  Sergeant Wheeler opened the door a third time, and Officer Nibecker deployed several beanbag rounds from a distance of approximately 15 feet.  *Id.*; Wheeler Decl. ¶ 4; *see* Eicher Decl. ¶ 7.  This time, the less lethal shotgun rounds struck Plaintiff, hitting him twice on his right leg, once on his right hand, once on his right arm, and once in his abdomen.  Nibecker Decl. ¶ 15.  This had little effect on Plaintiff.  *Id.*; *see* Wheeler Decl. ¶ 4.

Sergeant Wheeler then moved to the open door.  Nibecker Decl. ¶ 17; Wheeler Decl. ¶ 4. As Plaintiff slid across the seat toward the left side of the vehicle, Sergeant Wheeler deployed the second cartridge from his taser, which struck Plaintiff in the buttocks.  *Id.* (both).  Sergeant Wheeler then applied the taser as a "drive stun"[6] to Plaintiff's lower leg.  *Id.*  The combination of the taser probes and the drive stun subdued Plaintiff enough to allow officers to grab hold of Plaintiff's wrists and extract him from the vehicle.  *Id.*; *see also* Eicher Decl. ¶ 7.  Once outside, Plaintiff continued to resist, yelled obscenities, and made death threats against the officers. Nibecker Decl. ¶ 17; Eicher Decl. ¶ 7; Wheeler Decl. ¶ 4.  Sergeant Wheeler gave Officer Nibecker his taser while Sergeant Wheeler moved to the other side of the vehicle to assist the officers trying to contain Plaintiff.  Nibecker Decl. ¶ 17; Wheeler Decl. ¶ 4.  Officer Nibecker continued to cycle the taser.  *Id.* (both).  Plaintiff was eventually handcuffed, placed in a leg restraint, and placed on a gurney for transport to Natividad Medical Center for evaluation and treatment.  *Id.*; Eicher Decl. ¶ 7; *see* Sclimenti Decl. ¶ 18.

Plaintiff suffered multiple taser burns which became infected, a crushed right index finger

---

[6] *See infra.* at 16-18.

which required surgery, a right foot drop, bruises, and extensive subconjunctival hemorrhages. Opp'n at 2; Declaration of William Klamut ("Klamut Decl.") ¶ 15, Dkt. No. 59-2.  Moreover, Plaintiff "had only 20% use of his right index finger and underwent a second surgery in December of 2013." Opp'n at 2.

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 324-25.

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion.  Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 250.  All reasonable inferences must be drawn in the light most favorable to the nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However, it is not the task of the Court to scour the record in search of a genuine issue of triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).  Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine

United States District Court
Northern District of California

1    issue of fact, where the evidence is not set forth in the opposing papers with adequate references

2    so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031

3    (9th Cir. 2001).  If the nonmoving party fails to make this showing, "the moving party is entitled

4    to a judgment as a matter of law." *Celotex*, 477 U.S. at 322 (internal quotations omitted).

5          Additionally, at the summary judgment stage, parties must set out facts they will be able to

6    prove at trial.  At this stage, courts "do not focus on the admissibility of the evidence's form . . . .

7    [but] instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036

8    (9th Cir. 2003) (citation omitted).  "While the evidence presented at the summary judgment stage

9    does not yet need to be in a form that would be admissible at trial, the proponent must set out facts

10   that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d

11   966, 973 (9th Cir. 2010) (citations omitted).  Accordingly, "[t]o survive summary judgment, a

12   party does not necessarily have to produce evidence in a form that would be admissible at trial, as

13   long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City*

14   *of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001); *Celotex*, 477 U.S. at 324 (a party need not "produce

15   evidence in a form that would be admissible at trial in order to avoid summary judgment."); *see*

16   *also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must

17   be made on personal knowledge, set out facts that would be admissible in evidence, and show that

18   the affiant or declarant is competent to testify on the matters stated.").

19                          **EVIDENTIARY OBJECTIONS**

20         Before turning to the parties' substantive arguments, the Court addresses Defendants'

21   evidentiary objections to the Declaration of William Klamut (Klamut Decl., Dkt. No. 59-2) and

22   the Exhibit 2 to the Declaration of Stanley Goff (Goff Decl., Dkt. No. 59-1).  Reply at 1-3.

23   **A.     Paragraphs 5-10, 12, and 14 of the Klamut Declaration**

24         Defendants object to paragraphs 5-10, 12, and 14 as conclusory and without supporting

25   facts.  Reply at 1-2 (citing Fed. R. Evid. 602; Fed. R. Civ. P. 56(c)(2), (e)).  But "'objections to

26   evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes

27   an improper legal conclusion are all duplicative of the summary judgment standard itself' and are

28   unnecessary." *Smith v. Cty. of Santa Clara*, 2016 WL 4076193, at *8 (N.D. Cal. Aug. 1, 2016),

United States District Court
Northern District of California

*appeal dismissed* (Sept. 30, 2016) (citing *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)).  Accordingly, the Court **OVERRULES** Defendants' objections.

## B.       Paragraphs 5-14 of the Klamut Declaration

Defendants argue paragraphs 5-14 of the Klamut Declaration lack foundation.  Reply at 2 (citing Fed. R. Evid. 602).[7]  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see* Civil L.R. 7-5(b) ("An affidavit or declarations may contain only facts, must conform as much as possible to the requirements of Fed. R. Civ. P. 56(e), and must avoid conclusions and argument. Any statement made upon information or belief must specify the basis therefor.  An affidavit or declaration not in compliance with this rule may be stricken in whole or in part.").

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  This "sham affidavit" rule is necessary to protect the idea that "'[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action.'"  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (quoting *Celotex*, 477 U.S. at 327) (edits in *Vans Asdale*).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  *Kennedy*, 952 F.2d at 266 (internal quotation marks and edits omitted).

At the same time, the Ninth Circuit "recognize[s] that the sham affidavit rule is in tension

---

[7] Rule 602 provides that
> [a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

Fed. R. Evid. 602.

United States District Court
Northern District of California

1    with the principle that a court's role in deciding a summary judgment motion is not to make

2    credibility determinations or weigh conflicting evidence." *Van Asdale*, 577 F.3d at 998.

3    "Aggressive invocation of the rule also threatens to ensnare parties who may have simply been

4    confused during their deposition testimony and may encourage gamesmanship by opposing

5    attorneys." *Id.* Thus, the Ninth Circuit instructs courts to apply the rule "with caution" and

6    imposes "two important limitations on a district court's discretion to invoke the sham affidavit

7    rule." *Id.* First, "the district court must make a factual determination that the contradiction [is]

8    actually a 'sham.'" *Kennedy*, 952 F.2d at 267. Second, the "inconsistency between a party's

9    deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking

10   the affidavit." *Van Asdale*, 577 F.3d at 998–99.

11        Defendants contend the Klamut Declaration contradicts statements Plaintiff made in his

12   August 15, 2016 deposition that he has an independent recollection of the events at issue. Reply at

13   2; *see* Dkt. No. 62, Ex. A (Klamut Dep.) at 8:3-17. Specifically, Plaintiff testified in his

14   deposition that he could only remember "flashes" of the incident that were based on his

15   experience. *Id.* (both). In his Declaration, Plaintiff states that he "ha[s] actual knowledge of the

16   events that took place on the date of the incident and [] personally witnessed all of the events that

17   took place on the date of the incident." Klamut Decl. ¶ 3. He further declares

18
19              [t]hat the basis of [his] knowledge of the events that took place on
                the date of the incident involving [his] arrest are based on [his]
                review of the Exhibit 1 video that refreshed [his] recollection of the
20              events that took place on the date of the incident and the fact that
                [he] was the person who was arrested and was physically harmed as
21              a result of the arrest.

22   *Id.* ¶ 4. Defendants argue Plaintiff's declaration cannot "be rescued by the fig lea[f] of his

23   paragraph 4" and that Plaintiff's "refreshed" recollection is not a recollection at all. Reply at 2.

24   Instead, they contend Plaintiff's declaration is "strictly a third-party view of . . . the CHP

25   MVARS[.]" *Id.*; *see* Goff Decl., Ex. 1 ("MVARS") (on file under seal with the Court).

26        The Court **OVERRRULES** Defendants' objections to paragraph 5-14 of Plaintiff's

27   Declaration based on lack of foundation. Plaintiff's deposition testimony does not clearly

28   contradict his Declaration. In his deposition, Plaintiff did not testify that he had no recollection of

United States District Court
Northern District of California

12

the events on May 10, 2013; rather, he testified that he remembered "flashes" of them.  Klamut

Dep. at 8:3-5.  Indeed, Plaintiff testified about one particular memory:

> I remember another flash.  I was on the ground.  I don't—I was on my stomach and they were tasing me and I—I think—I don't think I was moving much there.  I believe they were just putting these Taser things on me.  And I—as they were tasing me, I was starting to get angry and I said, "Please stop.  I'm some kind of alien.  I don't want anyone to know."  As they were tasing me, I was getting angry.

*Id.* at 47:6-14.  Even if his memories are limited to flashes of the events, Plaintiff's deposition

testimony establishes he does have personal knowledge of the events.  Because Plaintiff's

Declaration does not directly contradict his deposition testimony, it is not a sham.

**C.      Paragraph 15 of the Klamut Declaration and Exhibit 2 to the Goff Declaration**

      Defendants object to paragraph 15 of the Klamut Declaration and Exhibit 2 of the Goff

Declaration on the basis that Plaintiff's alleged injuries are not relevant to the excessive force

inquiry.  Reply at 3; *see* Klamut Decl. ¶ 15 (describing injuries); Goff Decl., Ex. 2 (photos of

Plaintiff's injuries).

      "A court can award summary judgment only when there is no genuine dispute of material

fact.  It cannot rely on irrelevant facts, and thus relevance objections are redundant."  *Burch*, 433

F. Supp. 2d at 1119.  The Court therefore **OVERRULES** as moot Defendants' objections to

paragraph 15 of the Klamut Declaration and Exhibit 2 to the Goff Declaration.  Moreover, the

Court does not rely on these portions of the Klamut and Goff Declarations in ruling on

Defendants' Motion.

## DISCUSSION

      The Court previously granted summary judgment in favor of Defendants as to Officer

Nibecker's alleged use of excessive force to remove Plaintiff from Plaintiff's Subaru.  *See* First

Summ. J. Order.  This Order therefore addresses only Defendants' alleged use of excessive force

to remove Plaintiff from the patrol car, and analyzes their qualified immunity defense.  Defendants

argue there are no facts indicating their use of force was unreasonable and they are entitled to

qualified immunity.

//

United States District Court
Northern District of California

**A.      Legal Standard under 42 U.S.C. § 1983**

Section 1983 provides a remedy constitutional tort violations committed by state and local government officials.  It provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . .  or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.  "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks omitted).  To prevail on a § 1983 claim, "a plaintiff must show that (1) acts by the defendants (2) under color of state law (3) deprived him of federal rights, privileges or immunities and (4) caused him damage." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005) (internal quotation marks and brackets omitted).

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a . . . constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011).  An official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011).  In making this determination, courts consider the state of the law at the time of the alleged violation and the information possessed by the official to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007).  "[T]he salient question . . . is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged [conduct] was unconstitutional." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quotation omitted).  Courts exercise their sound discretion in deciding which prong of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case. *al-*

United States District Court
Northern District of California

1   *Kidd*, 131 S. Ct. at 2080.

2          "The plaintiff bears the burden of proof that the right allegedly violated was clearly

3   established." *Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014) (quotation omitted).  "To

4   meet this standard the very action in question need not have previously been held unlawful." *Id.*

5   (quotation and internal marks omitted).  This is particularly true in the Fourth Amendment

6   context, where the constitutional standard of "reasonableness" demands a fact-specific inquiry.

7   *Mattos*, 661 F.3d at 442.  The question is "whether a reasonable officer would have had fair notice

8   that [the action] was unlawful[.]"  *Tarabochia*, 766 F.3d at 1125 (quotation omitted).

9   Fundamentally, "[t]he qualified immunity doctrine rests on a balance between, on the one hand,

10  society's interest in promoting public officials' observance of citizens' constitutional rights and,

11  on the other, society's interest in assuring that public officials carry out their duties and thereby

12  advance the public good."  *Beier v. City of Lewiston*, 354 F.3d 1058, 1071 (9th Cir. 2004).

13  **B.      Excessive Force – Fourth Amendment**

14         "A claim that law-enforcement officers used excessive force to effect a seizure is governed

15  by the Fourth Amendment's 'reasonableness' standard."  *Plumhoff v. Rickard*, 134 S. Ct. 2012,

16  2020 (2014) (citing *Graham v. Connor*, 490 U.S. 386 (1989); additional citation omitted).

17  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth

18  Amendment requires a careful balancing of the nature and quality of the intrusion on the

19  individual's Fourth Amendment interests against the countervailing governmental interests at

20  stake."  *Graham*, 490 U.S. at 396 (internal quotation marks omitted).  In other words, courts "must

21  balance the amount of force applied against the need for that force."  *Bryan v. MacPherson*, 630

22  F.3d 805, 823 (9th Cir. 2010) (internal quotation marks omitted).

23         But the reasonable test "is not capable of precise definition or mechanical application," and

24  so courts must pay "careful attention to the facts and circumstances of each particular case[.]"

25  *Graham*, 490 U.S. at 396.  In the Ninth Circuit, courts "first consider[] the nature and quality of

26  the alleged intrusion[.]"  *Mattos*, 661 F.3d at 441.  They "then consider the governmental interests

27  at stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an

28  immediate threat to the safety of the officers or others, and (3) whether the suspect was actively

United States District Court
Northern District of California

15

resisting arrest or attempting to evade arrest by flight." *Id.* But "[t]hese factors are not exclusive; [courts] examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Thomas v. Dillard*, 818 F.3d 864, 889 (9th Cir. 2016), *as amended* (May 5, 2016) (internal quotation marks omitted).

"Reasonableness . . . 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Hughes v. Kisela*, 841 F.3d 1081, 1085 (9th Cir. 2016) (quoting *Graham*, 490 U.S. at 396). This is because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. Nonetheless, "[t]he question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of all the relevant circumstances." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir.), *cert. denied*, 135 S. Ct. 455 (2014) (citation omitted). "Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment . . . in excessive force cases should be granted sparingly. [ ] This is because police misconduct cases almost always turn on a jury's credibility determinations." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (internal citation omitted).

    1.   <u>Nature and Quality of the Intrusion</u>

Defendants used two different types of force against Plaintiff: a taser and a less lethal shotgun. The Court first considers the taser before turning to the less lethal shotgun. *See Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010) ("[W]e must evaluate the nature of the specific force employed in a specific factual situation.").

    a.   *Taser*[8]

---

[8] Although the parties do not identify the exact taser model Defendants used, Sergeant Wheeler presumably used a Taser X2. *See* Ex. A at 11, Declaration of Scott Seaman ("Seaman Decl."), Dkt. No. 58 ("I confirmed . . . that the California Highway Patrol utilizes the Taser X2 device throughout their department."). In *Bryan*, the taser in question was a Taser X26. 630 F.3d at 823. However, the *Bryan* court's holding applied to "the X26 *and similar devices*[.]" *Id.* at 826 (emphasis added). Neither party argues that the Taser X2 is so dissimilar so as to render *Bryan* inapplicable.

Sergeant Wheeler used a taser against Plaintiff.  Wheeler Decl. ¶ 4.  The parties do not dispute that tasers are considered an intermediate level of force.  Mot. at 18; Opp'n at 5.  "[T]asers . . . fall into the category of non-lethal force."  *Bryan*, 630 F.3d at 825.  But "[n]on-lethal . . . is not synonymous with non-excessive; all force—lethal and non-lethal—must be justified by the need for the specific level of force employed."  *Id.* (citing *Graham*, 490 U.S. at 395).  Tasers may be used in two modes: dart or drive-stun.  *See Mattos*, 661 F.3d at 443.  Sergeant Wheeler used his taser in both modes.  Mot. at 11; Wheeler Decl. ¶ 4; Nibecker Decl. ¶¶ 15, 17; Eicher Decl. ¶ 7.

A taser in dart mode

> uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the [taser] by insulated wires—toward the target at a rate of over 160 feet per second.  Upon striking a person, the [taser] delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles.

*Bryan*, 630 F.3d at 824.  "Using a Taser in dart mode constitutes an 'intermediate, significant level of force.'"  *Thomas*, 818 F.3d at 890 (quoting *Bryan*, 360 F.3d at 826).  "When a taser is used in drivestun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim."  *Mattos*, 661 F.3d at 443.  This "delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode."  *Id.*  "'Drive-stun mode' . . . encourages the suspect to comply by causing pain."  *Marquez v. City of Phoenix*, 693 F.3d 1167, 1171 (9th Cir. 2012), *as amended on denial of reh'g* (Oct. 4, 2012).

The Ninth Circuit has not determined what level of force is used when a taser is used in drive-stun mode.  *Mattos*, 661 F.3d at 443.  It has, however, noted that "the use of the Taser in drive-stun mode—as opposed to dart mode—seems unlike the force used in *Bryan* or uses of force which this court has previously considered severe."  *Brooks v. City of Seattle*, 599 F.3d 1018, 1027 (9th Cir. 2010), *overruled on other grounds sub nom. Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011).  Based on the facts in *Brooks*, the Ninth Circuit stated that "[a]lthough certainly a serious intrusion, . . . we find the quantum of force here to be less than the intermediate" (*id.*), but it has not made a determination generally as to the quantum of force of a taser in drive-stun mode

United States District Court
Northern District of California

beyond the limited, fact-specific situation in *Brooks*.  Nonetheless, it is not necessary to "decide this issue in order to assess the reasonableness of the tasing."  *Mattos*, 661 F.3d at 443.  "Whether or not [a defendant's] actions constituted application of 'deadly force,' all that matters is whether [the defendant's] actions were reasonable."  *Scott v. Harris*, 550 U.S. 372, 383 (2007).

b.     *Less Lethal Shotgun*

Officer Nibecker used a less lethal shotgun against Plaintiff.  Mot. at 11; Nibecker Decl. ¶ 15; Wheeler Decl. ¶ 4; Eicher Decl. ¶ 7.  A less lethal shotgun is "a twelve-gauge shotgun loaded with 'beanbag' rounds, which consist of lead shot contained in a cloth sack."  *Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (internal quotation marks and edits omitted).  Although "[t]his cloth-cased shot . . . is something akin to a rubber bullet," it "is not like a regular bullet—it does not normally rip through soft tissue and bone on contact with the human body."  *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001).  Rather, "[i]t is designed to knock down a target, rendering the individual incapable of resistance, without (in the normal course of deployment) resulting in death.  Nonetheless, the cloth-cased shot constitutes force which has the capability of causing serious injury, and in some instances does so."  *Id.*  A less lethal shotgun "falls short of deadly force as defined in this circuit: 'that force which is reasonably likely to cause *death*.'  *Id.* (emphasis in *Deorle*; quoting *Vera Cruz v. City of Escondido*, 139 F.3d 659, 663 (9th Cir. 1997), *as amended on denial of reh'g and reh'g en banc* (Mar. 31, 1998) *overruled on other grounds by Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005)).  But "[i]n light of this weapon's dangerous capabilities, such force, though less than deadly, is permissible only when a strong governmental interest compels the employment of such force."  *Glenn*, 673 F.3d 872 (quoting *Deorle*, 272 F.3d at 1280; edits in *Glenn*).

2.     Governmental Interest in Use of Force

Having determined the level of force, the Court turns to the government's interest in the use of that force.  Courts evaluate the government's interest by considering "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  *Bryan*, 630 F.3d at 826 (quoting *Graham*, 490 U.S. at 396).

18

United States District Court
Northern District of California

a.      *Severity of the Crime at Issue*

The first *Graham* factor requires the Court to consider the severity of Plaintiff's crime. The record does not indicate any offense that could be considered "severe."  Plaintiff's initial offense was a traffic violation.  *See* Mot. at 19 (citing Cal. Veh. Code § 21718 ("No person shall stop, park, or leave standing any vehicle upon a freeway[.]")).  But by the time Plaintiff was in the patrol car—the only incident now at issue—he was resisting arrest, the only offense for which he was cited.  *See* Mot. at 19, 21; Opp'n at 6.  In California, resisting arrest is a misdemeanor.  *See* Cal. Penal Code § 148(A)(1) ("Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."); *see id.* § 17(b) (defining a misdemeanor offense). "[W]hile disobeying a peace officer's order certainly provides more justification for force than does a minor traffic offense, such conduct still constitutes only a non-violent misdemeanor offense that will tend to justify force in far fewer circumstances than more serious offenses, such as violent felonies."  *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1164–65 (9th Cir. 2011) (collecting cases); *see Bryan*, 630 F.3d at 828 (noting that resisting a police officer and failure to comply with a lawful order are not "inherently dangerous or violent" offenses).

Thus, for purposes of the excessive force inquiry, Plaintiff's offense was nonserious. Accordingly, there was no substantial governmental interest in using significant force to effectuate Plaintiff's arrest for a minor offense.  *See Young*, 655 F.3d at 1164–65.

b.      *Whether Plaintiff Posed an Immediate Threat to Safety*

The second *Graham* factor—whether the suspect posed an immediate threat to the officer's or public's safety— is the most important consideration in this analysis.  *Thomas*, 818 F.3d at 889. Defendants argue that because Plaintiff "was freely mobile in the back of the patrol car[] and had the swinging handcuff to use as a weapon[,]" Defendants "reasoned that [Plaintiff] still continued to be a threat to anyone who tried to control him by just physical means."  Mot. at 21.  Defendants further contend, and Plaintiff does not dispute, that Plaintiff "yell[ed] obscenities and ma[d]e death threats against the officers."  Nibecker Decl. ¶ 17.

United States District Court
Northern District of California

It is insufficient that Plaintiff posed a threat; rather, the question is whether Plaintiff posed an *immediate* threat.  The Ninth Circuit focused on the immediacy of the threat in *Glenn v. Washington County*, where the decedent was holding a three-inch pocketknife when a police officer shot him with a beanbag round.  673 F.3d at 869.  The court noted that while the decedent did not obey officers' orders to drop the knife, he also did not attack or threaten to attack the officers and made no attempts to move.  *Id.* at 873-74.  Bystanders were inside a building or standing behind the police officers such that "a jury could conclude that no one was close enough to [the decedent] to be harmed by him before police could intervene."  *Id.* at 874.  In light of these facts, the Ninth Circuit held that "even though [the decedent] remained in possession of the pocketknife, a jury could conclude that at the moment the officers shot him with the beanbag gun there was little evidence that he posed an 'immediate threat' to anybody."  *Id.*

There is no indication Plaintiff posed an immediate threat to Defendants' safety, or the safety of others.  According to Defendants, "[P]laintiff's bizarre conduct, combativeness and unusual strength *did* threaten the officers physically and also threatened public safety in the form of bystanders at the scene, or anyone driving on Highway 101 if [P]laintiff got away from law enforcement or had been allowed to resume driving."  Reply at 10 (emphasis in original).  At this point, Plaintiff was in the back seat of a patrol vehicle on Bradley Road.  Further, despite Defendants' claim that bystanders' safety was at risk, Defendants do not identify any persons other than law enforcement officers who were on scene, and MVARS footage shows that only law enforcement officers were present.  *See* MVARS.  There was also no plausible risk that Plaintiff could drive away, given that he was in the back seat of the patrol vehicle's prisoner cage, and there is no indication that Plaintiff had or could obtain the keys to the vehicle or access the driver's seat.

Defendants point to Plaintiff's possession of a swinging handcuff as a reason to believe he posed an immediate threat.  Mot. at 21.  There was also "the fact that [Plaintiff] could have other weapons," something the officers considered while formulating a plan to remove Plaintiff from the patrol vehicle.  Nibecker Decl. ¶ 14.  While this caused Defendants "to reason[] that Klamut still continued to be a threat to anyone who tried to control him by just physical means" (Mot. at 21), Defendants' statements alone are insufficient to establish the exigency of the situation: "the threat

1    analysis must be based on objective factors and not merely 'a simple statement by an officer that

2    he fears for his safety or the safety of others[.]'" *Nelson v. City of Davis*, 685 F.3d 867, 880 (9th

3    Cir. 2012) (quoting *Deorle*, 272 F.3d at 1281).  Such objective factors are missing here.  "If the

4    person is armed—or reasonably suspected of being armed—a furtive movement, harrowing

5    gesture, or serious verbal threat might create an immediate threat." *George v. Morris*, 736 F.3d

6    829, 838 (9th Cir. 2013).  The record does not show that Defendants saw Plaintiff do any of those

7    things: there are no facts that Plaintiff brandished the handcuff at Defendants, threatened them

8    with it, or came within striking distance of Defendants.  *Cf. Long v. City & Cty. of Honolulu*, 511

9    F.3d 901, 906 (9th Cir. 2007) (police officer "had probable cause to believe that [the plaintiff]

10   posed an immediate danger" where officer "heard [the plaintiff] threaten to shoot the police,

11   observed him carrying a .22 caliber rifle, and knew that he had previously shot at a car full of

12   people and wounded two people therein earlier that night"); *Blanford v. Sacramento Cty.*, 406

13   F.3d 1110, 1112, 1116-18 (9th Cir. 2005) (plaintiff carrying a "2–1/2–foot–long Civil War-era

14   cavalry saber" posed a "serious threat" when he did not respond to officers' orders to drop the

15   sword and instead raised the sword, growled at officers, and attempted to enter home).  Nor is

16   there evidence that Plaintiff made any movement to reach for a hidden weapon.  *See Beaver v.

17   City of Fed. Way*, 507 F. Supp. 2d 1137, 1146 n.8 (W.D. Wash. 2007), *aff'd*, 301 F. App'x 704

18   (9th Cir. 2008) (finding "the danger that [the plaintiff] had a weapon hidden in his pants cannot

19   qualify as an 'immediate threat' under *Graham*" where the plaintiff's hands were visible or curled

20   under his stomach as commanded and where police officer "never saw [the plaintiff's] hands

21   reaching towards his waistband as if to retrieve a weapon").  Sergeant Wheeler states he

22   "[f]ear[ed] that another physical confrontation with Klamut would likely caused injury to

23   uniformed personnel and Klamut," but he does not explain why he thought a physical

24   confrontation was imminent.  In short, the record lacks objective facts that Plaintiff lunged toward

25   Defendants or otherwise attempted to physically engage them.

26         That Plaintiff was "freely mobile in the back of the patrol car" is also not indicative of an

27   immediate threat.  There is no evidence Plaintiff had attempted to flee or escape.  Although

28   Plaintiff extricated himself from the leg restraint and handcuffs, there are no facts indicating

United States District Court
Northern District of California

1    Plaintiff tried to run away or otherwise attempted to exit the patrol car.  On the contrary, Plaintiff

2    thereafter sought to remain in the patrol car.  *See Deorle*, 272 F.3d at 1282 (finding "no immediate

3    need to subdue [the plaintiff]" who "had roamed about the area and shouted in an irrational

4    manner, but had not harmed or attempted to harm anyone.  Nor had he attempted to flee or

5    escape.").  Although Plaintiff had an altercation with Officers Nibecker and Murillo and Deputy

6    Sclimenti as they extracted him from his vehicle, the record shows that this was only time that

7    Plaintiff became physical with the officers.  Plaintiff did not lunge at or attack the officers when

8    they simply spoke to him, and at no time while he was in the patrol car did he become violent.  *See*

9    Sclimenti Decl. ¶ 12 ("After Klamut was placed in the rear of my patrol car, he appeared to calm

10   down[.]").

11        Plaintiff's threats against Defendants are, in this case, also insufficient to create an

12   immediate threat.  Defendants do not provide any details about Plaintiff's threats, including what

13   precisely Plaintiff said.  *See George*, 736 F.3d at 838 ("If the person is armed—or reasonably

14   suspected of being armed—a . . . serious verbal threat might create an immediate threat.").

15   Defendants state that at one point, Plaintiff "made threats to slit the officers' throats."  Mot. at 8;

16   Nibecker Decl. ¶ 9.  But Plaintiff made this threat when Officer Nibecker removed Plaintiff from

17   Plaintiff's vehicle, an incident which is not at issue here.  There are no facts suggesting Plaintiff

18   made the same threat as Defendants extricated Plaintiff from the patrol car.

19        Moreover, according to Defendants' expert Scott Seaman, the CHP's policy regarding the

20   use of a less lethal shotgun states that an officer may use a less lethal shotgun under certain

21   circumstances, including when "[a] subject threatens to attack an officer, *and in the opinion of the*

22   *officer, the subject is capable of carrying out the threat*."  Seaman Report at 11, Dkt. No 58

23   (emphasis added).  But Defendants do not state they believed Plaintiff could follow through on his

24   threats, or offer any facts suggesting that he could do so.

25        In sum, based on the evidence before the Court on summary judgment, there are no

26   objective factors that would allow a reasonable fact finder to conclude Plaintiff presented an

27   immediate threat that justified the use of intermediate force.

28   //

c.      *Whether Plaintiff Actively Resisted or Attempted to Evade Arrest by Flight*

Defendants do not argue Plaintiff attempted to evade arrest by flight.  However, the parties dispute whether Plaintiff's actions constituted active or passive resistance.  *See* Mot. at 21; Opp'n at 8.  Courts distinguish between active and passive resistance.  *Bryan*, 630 F.3d at 830 (citations omitted).  But "'[r]esistance,' . . . should not be understood as a binary state, with resistance being either completely passive or active.  Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer."  *Id.*  Courts "must eschew ultimately unhelpful blanket labels and evaluate the nature of any resistance in light of the actual facts of the case."  *Id.*  "Even passive resistance may support the use of some degree of governmental force if necessary to attain compliance, however 'the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.'"  *Nelson*, 685 F.3d at 881 (quoting *Bryan*, 630 F.3d at 830).

Even viewing the facts in the light most favorable to Plaintiff, Plaintiff resisted arrest.  Officer Murillo ordered Plaintiff to exit the patrol vehicle.  Mot. at 11; Nibecker Decl. ¶ 15; Wheeler Decl. ¶ 4.  Plaintiff concedes that he ignored these orders.  *See* Opp'n at 2.  MVARS footage confirms that when Sergeant Wheeler[9] opened the vehicle door, Plaintiff stood up and shut the door.  *See* MVARS at 26:58-27:20.  When Sergeant Wheeler opened the door a second time, he deployed his taser through the open door, striking Plaintiff in the torso.  Mot. at 11.  Though Sergeant Wheeler's taser deployment is blocked from view in the MVARS footage, the video shows Plaintiff again closed the door without exiting the vehicle.  MVARS at 27:23-52; *see* Mot. at 11.  Sergeant Wheeler opened the door a third time.  MVARS at 27:55; *see* Mot. at 11; Nibecker Decl. ¶ 15; Wheeler Decl. ¶ 4.  At that point, the MVARS footage shows an officer— presumably Officer Nibecker—deploying a less lethal shotgun.  MVARS at 28:00.  Plaintiff appears to remain in the vehicle until several officers surround the opposite side of the patrol car, and Sergeant Wheeler and Officer Nibecker enter the vehicle.  MVARS 29:00-48.  Only by pulling Plaintiff out of the vehicle were the officers able to restrain him.  Mot. at 11-12; Nibecker

---

[9] Plaintiff does not identify which officer opened the vehicle door; however, Plaintiff does not dispute Defendants' identification of Sergeant Wheeler.

United States District Court
Northern District of California

1    Decl. ¶ 17; Wheeler Decl. ¶ 4.

2        Plaintiff's refusal to heed the officers' commands, on its own, does not constitute active

3    resistance.  *See Nelson*, 685 F.3d at 881 ("[A] failure to fully or immediately comply with an

4    officer's orders neither rises to the level of active resistance nor justifies the application of a non-

5    trivial amount of force."); *Bryan*, 630 F.3d at 829-30 ("Even if [the plaintiff] failed to comply with

6    the command to remain in his vehicle, such noncompliance does not constitute 'active resistance'

7    supporting a substantial use of force."); *Smith*, 394 F.3d at 703 (plaintiff's refusal to remove hands

8    from pockets, reentry into home, and "brief" physical resistance did not constitute "particularly

9    bellicose" resistance, where plaintiff did not run from or attack officers).  But Plaintiff did more

10   than ignore commands; he also shut the vehicle door repeatedly and refused to exit the patrol car.

11   These actions transform Plaintiff's resistance into something more than purely passive.

12       That said, Plaintiff's resistance was less than active.  In *Mattos*, the Ninth Circuit found

13   that plaintiff Brooks "engaged in some resistance to arrest" when she "refused to get out of her car

14   when requested to do so and later stiffened her body and clutched her steering wheel to frustrate

15   the officers' efforts to remove her from her car."  661 F.3d at 445.  However, the court also noted

16   that Brooks' "resistance did not involve any violent actions towards the officers.  In addition,

17   Brooks did not attempt to flee, and there were no other exigent circumstances at the time."  *Id.*

18   Nonetheless, the *Mattos* court characterized Brooks' resistance as active "insofar as she refused to

19   get out of her car when instructed to do so and stiffened her body and clutched her steering wheel

20   to frustrate the officers' efforts to remove her from her car."  *Id.* at 446.  As in *Mattos*, Plaintiff's

21   closing of the vehicle door frustrated Defendants' efforts to remove him, but there is no evidence

22   Plaintiff attempted to flee or was violent toward the officers.  Furthermore, there are no objective

23   facts suggesting Plaintiff was armed.  By this point, Officer Murillo had taken the knife away from

24   Plaintiff, and there are no facts that indicate Plaintiff had another weapon hidden on his person.

25       Indeed, Defendants only argue that Plaintiff "continued to resist," but they do not describe

26   what constituted that resistance or assert that Plaintiff acted violently.  *See* Mot. at 11.  There are

27   no facts, for instance, indicating Plaintiff did anything more that stiffen his body, let alone

28   physically attacked Defendants at the time Defendants used force against him.

24

1    Accordingly, while a reasonably jury could conclude that although Plaintiff engaged in

2    more than passive resistance, the evidence before the Court on summary judgment does not

3    establish Plaintiff actively resisted.

4            d.    *Other Factors*

5    In addition to the *Graham* factors, courts also "examine the totality of the circumstances

6    and consider whatever specific factors may be appropriate in a particular case, whether or not

7    listed in *Graham*." *Bryan*, 630 F.3d at 826 (internal quotation marks omitted).

8                 i.    Failure to Warn

9    First, Plaintiff argues the Court should consider Defendants' failure to give a warning

10   before using the taser or the less lethal shotgun, but he does not explain how the lack of a warning

11   supports a finding of a constitutional violation in this case.  Opp'n at 9-10.  "[T]he absence of a

12   warning of the imminent use of force, when giving such a warning is plausible, weighs in favor of

13   finding a constitutional violation." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir.

14   2013) (citing *Mattos*, 661 F.3d at 451; *Deorle*, 272 F.3d at 1283–84).  In *Deorle*, the Ninth Circuit

15   clarified that it "d[id] not hold . . . that warnings are required whenever less than deadly force is

16   employed." 272 F.3d at 1284.  "Rather, . . . such warnings *should* be given, when feasible, if the

17   use of force may result in serious injury, and that the giving of a warning or the failure to do so is

18   a factor to be considered in applying the *Graham* balancing test." *Id.* (emphasis added).

19   Defendants argue the lack of warning does not create a triable issue of fact.  Reply at 6.

20   They contend "[P]laintiff knew the ramifications of resistance" because "his failure to comply

21   with instructions to exit his Subaru" caused Officer Nibecker to "repeated[ly] deploy[]" his taser.

22   *Id.*  Defendants do not address whether it was feasible to give a warning and thus fail to

23   demonstrate there is no trial fact on the issue.

24   Plaintiff fails to point to any facts showing that it was feasible to give a warning here.

25   Plaintiff only declares that Defendants did not warn him prior to deploying the taser and less lethal

26   shotgun. *See* Opp'n at 9 (citing Klamut Decl. ¶¶ 9-10).  "When the nonmoving party relies only

27   on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations

28   unsupported by factual data to create an issue of material fact." *Hansen v. United States*, 7 F.3d

United States District Court
Northern District of California

United States District Court
Northern District of California

137, 138 (9th Cir. 1993). Plaintiff's Declaration is unsupported by any facts in the record. Plaintiff's MVARS footage—the only other evidence Plaintiff submits—consists only of visual material; there is no accompanying audio recording to show Defendants did not provide a warning prior to the use of force. As such, Plaintiff's Declaration is insufficient to create a genuine dispute of material fact.

In short, Defendants fail to demonstrate a lack of triable fact and Plaintiff fails to show any dispute of material facts regarding Defendants' lack of warning. Thus, the Court cannot find Defendants' lack of warning factors into the Fourth Amendment analysis at this stage.

ii.     Mental Illness

Second, Plaintiff argues his mental illness must be taken into consideration when evaluating the totality of the circumstances. The Ninth Circuit "ha[s] held that a [plaintiff'] mental illness must be reflected in any assessment of the government's interest in the use of force[.]" *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (citing *Deorle*, 272 F.3d at 1282-83). But there is no "per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals." *Deorle*, 272 F.3d at 1283. "Instead, [the Ninth Circuit] emphasize[s] that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed." *Id.*

Defendants argue there is no evidence that Plaintiff suffered from mental illness. Reply at 8. Defendants meet their burden of production with respect to Sergeant Wheeler, but not with respect to Officer Nibecker. Nibecker observed that "Klamut acted strangely, saying he was from another planet; then he appeared to go to sleep; then he became alert and began yelling at the officers." Nibecker Decl. ¶ 12. While Officer Nibecker's previous observations of Plaintiff led him to "believe[] Klamut was under the influence of a controlled substance due to his abnormal strength and behavior" (*id.* ¶ 9), a reasonable trier of fact could conclude a person acting like Plaintiff and saying he was from another planet indicated the person was mentally ill. As to Sergeant Wheeler, Defendants have demonstrated there are no facts that Sergeant Wheeler was or should have been aware that Plaintiff was mentally ill, as Sergeant Wheeler arrived after Plaintiff

26

shouted he was an alien.  *See* Wheeler Decl. ¶ 2.

Plaintiff offers no facts showing Sergeant Wheeler was made aware of Plaintiff's statements.  The record indicates only that Sergeant Wheeler was informed of Plaintiff's unusual strength, which he believed was drug-induced.  Wheeler Decl. ¶ 3.  Dr. Froelich's Declaration does not create a triable issue of fact that Sergeant Wheeler (or Officer Nibecker) should have known Plaintiff suffered from mental illness.  *See* Opp'n at 10; Froelich Decl., Dkt. No. 59-3.  Dr. Froelich states "[t]hat [she] told police and explained the plaintiff's problem with sleep deprivation and told them he was probably having a psychotic episode secondary to sleep deprivation."  Froelich Decl. ¶ 2.  Dr. Froelich does not specify to whom she spoke or when, and there are no facts that she spoke to either Defendant at any time before they extracted him from the patrol car.  Deputy Sclimenti states he spoke to Dr. Froelich after finding texts from her on Plaintiff's phone after officers removed Plaintiff from the Subaru.  *See* Sclimenti Decl. ¶ 13.  He declares Dr. Froelich did not tell him that Plaintiff suffered from a mental illness, but that she "advised that he was sleep deprived and that was probably why he was acting so strange."  *Id.*  There is no evidence suggesting Deputy Sclimenti, or any other law enforcement officer, relayed Dr. Froelich's information to Defendants.  Dr. Froelich also does not explain why she believed Plaintiff was experiencing a psychotic episode at that time.  *See* Froelich Decl.  For instance, she does not describe how she knew Plaintiff suffered from sleep deprivation at that time, or how Plaintiff's behavior indicated he was having a psychotic episode.  Indeed, Plaintiff testified in his deposition that his family did not know he was having delusions—because he was not having any.  Klamut Dep. at 22:25-23:2.  Plaintiff further testified that although he had seen a psychologist, he had never been diagnosed with a mental illness.  *Id.* at 16:14-16, 22:16-24, 53:20-54:12.  Moreover, Plaintiff provides no expert testimony or other facts establishing Defendants received training to recognize signs of mental illness and should have acted accordingly.

Thus, while a reasonable jury could conclude that Officer Nibecker knew of should have known that Plaintiff was mentally ill, there are no facts for the jury to conclude Sergeant Wheeler could or should have done the same.

//

United States District Court
Northern District of California

### C.   Balancing Conflicting Interests

Based on the foregoing *Graham* analysis and viewing the facts in the light most favorable to Plaintiff, the Court cannot find Defendants' use of force was objectively reasonable on summary judgment.  Plaintiff had not committed a violent or serious crime, and there are sufficient facts that suggest Plaintiff did not pose an immediate threat to Defendants' or bystanders' safety.  Though he possessed a swinging handcuff, nothing in the record indicates Plaintiff attempted to use it as a weapon.  Nor are there objective facts that show Plaintiff tried to use a concealed weapon against Defendants.  Moreover, the events took place off Highway 101, away from any traffic or passersby.  Plaintiff did not obey officers' orders to get out of the car, but he also did not physically attack officers or attempt to flee; he closed the patrol vehicle's door and refused to exit the vehicle.

In light of these circumstances, the Court cannot find a strong governmental interest compelled Sergeant Wheeler's use of the taser or Officer Nibecker's use of the less lethal shotgun.  Defendants did not use the taser or the less lethal shotgun to subdue Plaintiff, but as a means to extract Plaintiff from the patrol car.  Indeed, Sergeant Wheeler states he used the taser preemptively, so as to avoid a physical altercation.  *See* Wheeler Decl. ¶ 4 ("Fearing another physical confrontation with Klamut . . . I deployed my CEW through the open door, striking Klamut in the upper torso.").  Sergeant Wheeler also used the taser as Plaintiff was moving *away* from him.  *See* Wheeler Decl. ¶ 4 ("I moved into the open doorway of the patrol vehicle and Klamut moved across the back seat toward the left side of the parolve vehicle.  I deployed the second cartridge from my CEW, striking Klamut in the buttock."); Nibecker Decl. ¶ 17 ("Sergeant Wheeler moved to the open doorway and, as Klamut slid across the seat toward the left side of the vehicle, deployed the second cartridge from his CEW, striking Klamut in the buttocks.  Sergeant Wheeler then applied the CEW as a 'drive stun' to Klamut's lower leg.").  Officer Nibecker used the less lethal shotgun in a similar manner.  He states that after "Sergeant Wheeler opened the [vehicle's] door a third time, . . . I deployed several rounds from his less lethal shotgun at a distance of approximately 15 feet, striking Klamut two times on his right leg, one time on his right hand, one time on his right arm and one time in the abdomen."  Nibecker Decl. ¶ 15.  But at no

point do Defendants assert that Plaintiff did anything more than remain seated in the vehicle. Further, Defendants do not contend they used the weapons while Plaintiff was outside the vehicle—the only point during this incident in which Defendants alleges they physically engaged with Plaintiff.  *See id.* ¶ 7; Wheeler Decl. ¶ 4; Eicher Decl. ¶ 7.

While the use of force may have accelerated Plaintiff's arrest, there are no facts presently before the Court that indicate Defendants could not have attempted further discussions with Plaintiff to persuade him to comply.  Indeed, that Officer Murillo was able to convince Plaintiff to hand over his knife suggests that Plaintiff could be convinced to obey orders and did not threaten to harm the officers.  "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury."  *Bryan*, 630 F.3d at 826.  As such, the Court cannot find as a matter of law that a strong governmental interest justified Defendants' use of force.

**D.    Qualified Immunity**

Where the evidence indicates a potential constitutional violation, the Court proceeds to the second prong of the qualified immunity analysis which requires the Court to consider "whether the constitutional right was clearly established at the time of the conduct[.]"  *Mattos*, 661 F3d at 442.

Defendants appear to argue they should be entitled to qualified immunity because courts had found that an officer is entitled to such protection, even where the use of force was found to be excessive.  *See* Mot. at 24-25 (collecting cases).  According to Defendants, Ninth Circuit case law "show[s] that, as of May[] 2013, a reasonable officer would not have known that deploying a taser, either in dart or stun mode, or a less-lethal shotgun with beanbag rounds, would violate the Constitutional rights of a suspect who strongly and wildly resisted officers' efforts to handcuff him twice."  *Id.* at 24 (emphasis omitted).

Defendants' argument ignores the fact that the qualified immunity analysis is time-specific: the question is whether the constitutional right was clearly established at the time of the alleged misconduct.  The cases Defendants cite are thus distinguishable.  *See* Mot. at 24-25 (citing *Mattos*, 611 F.3d; *Bryan*, 630 F.3d; *Ciampi v. City of Palo Alto*, 790 F. Supp. 2d 1077 (N.D. Cal.

United States District Court
Northern District of California

1   2011)).[10]

2        In *Bryan*, the Ninth Circuit held that although the police officer's use of a taser in dart

3   mode constituted excessive force, the officer was entitled to qualified immunity because on the

4   date of the incident, "July 24, 2005, there was no Supreme Court decision or decision of our court

5   addressing whether the use of a taser . . . in dart mode constituted an intermediate level of force."

6   630 F.3d at 833.  "Indeed, before that date, the only statement [the Ninth Circuit] had made

7   regarding tasers in a published opinion was that they were among the 'variety of non-lethal 'pain

8   compliance' weapons used by police forces.'"  *Id.* (quoting *San Jose Charter of Hells Angels*

9   *Motorcycle Club v. City of San Jose*, 402 F.3d 962, 969 n.8 (9th Cir. 2005)).  This lack of

10  authority meant "a reasonable officer in [the defendant]'s position could have made a reasonable

11  mistake of law regarding the constitutionality of the taser use in the circumstances [the defendant]

12  confronted in July 2005."  *Id.*

13       The *Mattos* court also held there was no case law regarding the constitutionality of tasers

14  in 2004 and 2006, which required granting qualified immunity to the officers.  661 F.3d at 436,

15  438, 452 (citing *Bryan*, 630 F.3d at 833); *see id.* at 448 (noting "there were no circuit taser cases

16  finding a Fourth Amendment violation").  Absent Ninth Circuit precedent, the court addressed

17  three out-of-circuit cases that had considered the use of a taser prior to the events in question:

18  *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044-45 (6th Cir. 1992); *Hinton v. City of Elwood*,

19  _____

20  [10] Defendants also cite three out-of-circuit cases: *Hagans v. Franklin County Sheriff's Office*, 695
    F.3d 505 (6th Cir. 2012); *Abbot v. Sangamon County, Illinois*, 705 F.3d 706 (7th Cir. 2013); and

21  *Hoyt v. Cooks*, 672 F.3d 972 (11th Cir. 2012).  *Hagans*, *Abbott*, and *Hoyt* are factually
    distinguishable.  In those cases, the plaintiff actively resisted arrest.  *See Hagans*, 695 F.3d at 508-

22  09 (finding no constitutional violation and thus granting qualified immunity where officer "us[ed]
    a taser repeatedly on a suspect actively resisting arrest and refusing to be handcuffed amounted to

23  excessive force."); *Abbott*, 705 F.3d at 726-28 (noting that "[c]ourts generally hold that the use of
    a taser against an actively resisting suspect either does not violate clearly established law or is

24  constitutionally reasonable" such that "[i]nsofar as [the plaintiff] continued to resist after the first
    tasing, [the defendant deputy] did not violate clearly established law by using the taser in

25  drivestun mode several more times until [the plaintiff] was subdued" and holding defendant was
    entitled to qualified immunity); *Hoyt*, 672 F.3d 978-80 (officers entitled to qualified immunity

26  where officers tased decedent after decedent "committed assault and battery on a police officer by
    lunging through the patrol car window and grabbing the officer's shirt while threatening to kill

27  him").  As explained above, Plaintiff's resistance was less than active.

28

United States District Court
Northern District of California

997 F.2d 774, 782 (10th Cir. 1993); and *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004). *Id.* at 446-48. Although the *Russo*, *Hinton*, and *Draper* courts "reject[ed] claims that the use of a taser constituted excessive force[,]" they were factually distinguishable in that the decedent or plaintiff in those cases actively resisted arrest and/or posed an imminent threat of harm. Consequently, the court "c[ould ]not conclude, . . . in light of these existing precedents, that *every* reasonable official would have understood *beyond debate* that tasing [the plaintiff] in these circumstances constituted excessive force." *Id.* at 448 (emphasis in original; internal quotation marks and edits omitted).

    *Ciampi v. City of Palo Alto* is inapposite for the same reason: there was no case law in 2008 when defendant tased plaintiff in dart mode—i.e., pre-*Bryan*—there was no case law that clearly defined the right. *See* 790 F. Supp. 2d at 1085, 1100-03. The *Ciampi* court did "not f[i]nd that the law regarding Tasers was significantly clarified between 2005, when the conduct in *Bryan* occurred, and March 15, 2008, when the incident at issue in this case occurred. *Bryan* thus appear[ed] to compel a finding of qualified immunity in this case." *Id.* at 1103.

    In sum, the *Bryan*, *Mattos*, and *Ciampi* courts found the defendants were entitled to qualified immunity because at the time of the events at issue in those cases, there was no case law that addressed the use of a taser. As a result, those defendants could not have reasonably known that the use of a taser under the applicable circumstances was unconstitutional. But each of these cases also clearly established as early as 2011 when the Ninth Circuit issued its opinion in *Bryan*, that the use of a taser and a less lethal shotgun require a strong governmental interest to justify their use. Thus, in May 2013, a reasonable officer in Sergeant Wheeler's position should have known that using a taser on someone who never attempted to flee, did not advance toward Defendants, and did not pose a flight risk or an immediate threat of harm could constitute excessive force. *See id.* at 832. The Court therefore finds Sergeant Wheeler is not entitled to qualified immunity.

    Second, although Defendants contend "several 'qualified immunity' decisions in the Ninth Circuit show that, as of May[] 2013, a reasonable officer would not have known that deploying . . . a less lethal shotgun with beanbag rounds would violate" Plaintiff's constitutional rights (Mot. at

24), none of the cases Defendants cite concern the use of a less lethal shotgun (*see id.*).

Nonetheless, it was clear as early as 2001 that a less lethal shotgun, "though less than deadly, is

not to be deployed lightly" and "is permissible only when a strong governmental interest compels

the employment of such force." *Deorle*, 272 F.3d at 1280.  A reasonable officer in Officer

Nibecker's position, faced with a similar scenario, should have concluded that shooting Plaintiff

with a less lethal shotgun could constitute an unreasonable degree of force, where Plaintiff had not

committed a serious offense, was not actively resisting, and did not pose an objectively reasonable

imminent threat of harm.  *See Booke v. Cty. of Fresno*, 98 F. Supp. 3d 1103, 1121 (E.D. Cal. 2015)

(denying qualified immunity to defendant who, in 2012, shot plaintiff with a beanbag round where

plaintiff "was not an immediate threat, was not actively resisting or evading arrest, and was not

suspected of committing a serious offense").  Accordingly, the Court finds Officer Nibecker is not

entitled to qualified immunity.

## CONCLUSION

Based on the foregoing analysis, the Court **DENIES** Defendants' Motion for Summary

Judgment.[11]  The Court further **ORDERS** the parties to attend a settlement conference before a

magistrate judge to take place within 60 days from the date of this Order.

**IT IS SO ORDERED.**


Dated: February 7, 2017

_____
MARIA-ELENA JAMES
United States Magistrate Judge

---

[11] In so holding, the Court also **DENIES** Defendants' request for attorneys' fees.  *See* Mot. at 25.

32